**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COXCOM, LLC, d/b/a COX COMMUNICATIONS, <br><br> Plaintiff, <br><br> v. <br><br> SUPER TOWERS, INC., and WNAC, LLC, <br><br> Defendants. | Case No. 1:21-cv-11124-DJC |

### PLAINTIFF COXCOM, LLC'S MEMORANDUM IN SUPPORT OF ITS EMERGENCY MOTION FOR DECLARATORY JUDGMENT

Plaintiff CoxCom, LLC, d/b/a Cox Communications, ("Cox") submits this memorandum in support of its emergency motion for declaratory judgment against Defendants Super Towers, Inc. ("Super Towers") and WNAC, LLC ("WNAC") under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57.

**I.    INTRODUCTION**

The straightforward legal question before this Court is whether Defendants were required to assign a retransmission consent agreement ("WNAC Agreement," filed under seal as Exhibit 1) when they sold a broadcast television station governed by that agreement. The plain language in the assignment provision of the WNAC Agreement, as well as black-letter contract law, make clear they were. Accordingly, the Court should enter declaratory judgment to define the parties' rights and legal relations under the WNAC Agreement.

*First*, an actual controversy requires declaratory judgment. On June 15, 2021, Defendants transferred ownership of a TV station ("WNAC station") but failed to assign the WNAC Agreement between Cox and Defendants to WNAC's buyer, as the agreement requires and

Defendants represented they would. That failure would require Cox to pay substantially more—approximately $4,000,000.00—to the buyer, Mission Broadcasting, Inc. ("Mission"), for the same retransmission consent rights Cox already has under the WNAC Agreement. In fact, Cox's first payment to Mission as the new owner of the WNAC station is coming due on August 16, 2021. If Cox were to pay Mission the lower fees and continue to retransmit the station under the WNAC Agreement (as it should), Cox exposes itself to claims for breach of contract, copyright infringement, and FCC regulatory enforcement, which Defendants must indemnify. But Defendants will not agree to terms for the August 16 payment or their indemnity with Cox. Thus, Cox requests that this Court enter declaratory judgment to resolve the dispute.

*Second*, declaratory judgment should be entered because the assignment provision in the WNAC Agreement involves a question of law for the Court. In clear and unambiguous language, the WNAC Agreement required Defendants to assign the WNAC Agreement *at Cox's request*. Indeed, the terms required assignment at Cox's request "regardless of whether [Cox] has a retransmission consent agreement in effect" with Mission and "regardless of any conflicting 'after-acquired station' language contained therein to the contrary." (Ex. 1 § 18(b).) In 2017, and again in early 2020, Defendants and their sophisticated legal counsel negotiated—and reaffirmed—these clear terms with Cox. Later in 2020, when Defendants negotiated to sell their interest to Mission, Defendants confirmed their understanding of these terms and promised they would assign the WNAC Agreement to Mission. As a result, Cox demanded and consented to the assignment.

Now that Defendants' transfer of the station *has* occurred, Defendants want to avoid their assignment agreement with Cox. Defendants now claim an entirely separate agreement between Cox and Mission creates ambiguity in the interpretation of the assignment provision in the WNAC Agreement. But the WNAC Agreement *itself* defines the terms of the agreement between Defendants and Cox. Defendants' choice to sell to Mission does not, and cannot, alter the clear

2

assignment terms in the WNAC Agreement. Moreover, if in their negotiations Defendants could not get Mission to assume the WNAC Agreement (as they represented), the choice was theirs to call off or complete the transaction. That choice cannot erase their agreement with Cox. In any event, even if contract interpretation principles and extrinsic evidence were needed to resolve a dispute between the WNAC and Mission Agreements, there is no reasonable question that Defendants had to assign the WNAC Agreement in the first instance.

Cox thus requests that this Court declare its rights and other legal relations under the Declaratory Judgment Act and WNAC Agreement. Specifically, Cox requests that the Court issue an order declaring that (a) Defendants were required to have Mission assume and agree to the WNAC Agreement; (b) the terms of the WNAC Agreement remain in full force and effect until 11:59 p.m. EST on February 23, 2023, or until further order of this Court; (c) Cox does not infringe upon WNAC's copyright by continuing to retransmit the WNAC broadcast signal under the terms of the WNAC Agreement; and (d) Defendants shall indemnify and hold harmless Cox against any third-party claims, liability, causes of action, and costs (including reasonable attorneys' fees) arising from, or in connection with, Defendants' breach of the WNAC Agreement.

## II.   <u>LEGAL STANDARD</u>

This Court has authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. The Act merely requires an "actual controversy within its jurisdiction" and "the filing of an appropriate pleading." *Id.*

Declaratory judgment is warranted when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" relief. *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). The controversy must "be definite and concrete, touching the legal relations of parties having adverse legal interests [and] . . . be real and substantial and admi[t] of

specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). An action for declaratory judgment is ripe for judicial resolution where the issue presented is fit for review and withholding judgment would impose hardship on the parties. *Riva v. Ashland, Inc.*, No. 09-cv-12074-DJC, 2013 WL 1222393, at *8 (D. Mass. Mar. 26, 2013). An action is not fit for review if it involves "uncertain and contingent events that may not occur as anticipated or may not occur at all." *Id.* The hardship element is satisfied where "the challenged action creates a direct and immediate dilemma for the parties." *Id.* (quoting *Stern v. U.S. Dist. Court*, 214 F.3d 4, 10 (1st Cir. 2000)); *Verizon New England, Inc. v. Int'l Brotherhood of Elec. Workers*, 651 F.3d 176, 188 (1st Cir. 2011) (holding the key question is "whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest").

Where an action for declaratory judgment is ripe for adjudication, the Court may treat a motion for declaratory judgment as one for summary judgment. *Algonquin Gas Transmission, LLC v. Town of Weymouth*, 365 F. Supp. 3d 147, 151 (D. Mass. 2019); *Shurtleff v. City of Bos.*, No. 18-CV-11417-DJC, 2020 WL 555248, at *1 (D. Mass. Feb. 4, 2020), *aff'd*, 986 F.3d 78 (1st Cir. 2021). The moving party therefore must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court may then "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. And "[a]ny such declaration shall have the force and effect of a final judgment or decree." *Id.*

## III.   FACTS

Cox provides cable television, among other services, to American households and businesses. (Decl. Chris Tygh, Aug. 2, 2021 ("Tygh Decl."), ¶ 10.) Effective March 1, 2017, Cox

entered into a retransmission consent agreement ("WNAC Agreement") with Super Towers and WNAC for Cox to retransmit the digital broadcast of a TV station ("WNAC station") owned by Super Towers and WNAC that serves the Providence—New Bedford market. (*Id.*, Ex. 1.) Cox, Super Towers, and WNAC amended and extended the WNAC Agreement on February 11, 2020. (*Id.*, Ex. 2.) According to the amended and extended WNAC Agreement, its terms remain in full force and effect until 11:59 p.m. Eastern Standard Time on February 23, 2023. (*Id.*, Ex. 2.) Under the WNAC Agreement, Cox agreed to pay Super Towers and WNAC a monthly license fee per subscriber in exchange for the right to retransmit the WNAC broadcast television signal. (*Id.*)

At the time Cox and Defendants entered into the WNAC Agreement in 2017, and when they amended and extended it in 2020, Cox and Defendants negotiated an assignment provision that reflected their bargaining positions. (*Id.* ¶ 27.) "After-acquired station" clauses were common in the industry, in which station owners buying a new station assume the station's broadcasting terms and conditions under an existing agreement. (*Id.* ¶¶ 8–9, 23–25.) Defendants and their counsel also knew that Cox had entered into other retransmission agreements with other station owners and that stations were commonly sold to new owners who had retransmission agreements with cable operators like Cox. (*Id.* ¶¶ 23–25.) Chris Tygh, Cox's Vice President of Content Acquisition, likewise was familiar with the function and purpose of "after-acquired station" clauses both in the industry generally and in Cox's retransmission agreements with other station owners. (*Id.* ¶¶ 8–9.) Moreover, during the 2017 and 2020 negotiations, Mr. Tygh was involved in establishing and meeting the budget for Cox's retransmission consent deals; it was a crucial component of Cox's bargaining position that any agreement to retransmit the WNAC station guarantee that any future station purchaser would be bound by the terms of the WNAC Agreement, including that agreement's rates, for its entire term, not any pre-existing agreement Cox may have had with that owner for other stations. (*Id.* ¶ 26.)

Thus, the parties agreed to a favorable assignment provision for Cox in Section 18(b) of the WNAC Agreement. (*Id.* ¶ 27.) Section 18(b) required that if Super Towers and/or WNAC sold, transferred, assigned, or otherwise disposed of its ownership interest in one or more stations to a third party (defined as a "Station Transferee"), then *at Cox's request*, Super Towers and WNAC had to require the Station Transferee to assume the WNAC Retransmission Agreement, to agree to abide by the terms through the rest of the term, *and to agree that the terms supersede any conflicting provision in any other retransmission consent agreement*:

18.    Assignments: Divested Systems and Stations.

(b)    This Agreement may not be assigned by Broadcaster [Super Towers and WNAC] without the prior written consent of Operator [Cox], … <u>provided</u>, that Broadcaster [Super Towers and WNAC] may assign this Agreement without the consent of Operator [Cox] (but upon prior written notice to Operator [Cox]) to (i) any Broadcaster Entity, or (ii) any entity acquiring all or substantially all of the assets of Broadcaster [Super Towers and WNAC] or any Station(s); **provided, further, that any assignee assumes all of Broadcaster's [Super Towers and WNAC's] obligations arising hereunder with respect to the applicable Station(s).** … Notwithstanding the foregoing, **if Broadcaster [Super Towers and WNAC] sells, transfers, assigns or otherwise disposes of its ownership interest in one or more Stations to a third party (the "Station Transferee"), then at Operator's [Cox's] request, Broadcaster [Super Towers and WNAC] shall require such Station Transferee** (i) to assume this Agreement with respect to such Station(s) and the applicable terms and conditions hereof and agree to abide by the terms hereof through the remainder of the Term, regardless of whether Operator [Cox] has a retransmission consent agreement in effect with such Station Transferee for the carriage of other broadcast television signals (and **regardless of any conflicting "after-acquired station" language contained therein to the contrary**, and (ii) to agree that the terms herein shall supersede any conflicting provision in any such other retransmission consent agreement, regardless of which agreement was signed later and **regardless of any conflicting provision in such other agreement that purports to supersede conflicting provisions in other agreements[.]**

(*Id.*, Ex. 1 § 18(b) (emphasis added).) The WNAC Agreement further provided that Super Towers and WNAC must indemnify and hold harmless Cox for any claims or losses arising out of their breach of the agreement. (*Id.*, Ex. 1 § 14(a).)

In November 2020, Super Towers and WNAC informed Cox that Super Towers intended

to assign the FCC broadcast license of and sell the ownership interest in the WNAC station to third-party Mission. (*Id.*, ¶ 29.) In an unrelated and separate transaction, Cox had entered into a retransmission agreement with Mission on December 28, 2018—i.e., after the WNAC Agreement was originally entered, but before it was amended and extended—to retransmit the broadcast signal of other TV stations owned by Mission ("Mission Agreement"). Section 19 of the Mission Agreement includes an "after-acquired station" clause:

> Except as otherwise provided below, for the avoidance of doubt, the provisions of this Section 19 shall control all retransmission of television stations acquired by Broadcaster . . . after the date hereof on all Eligible Systems owned, built or acquired by Operator during the term **notwithstanding any conflicting provisions contained in any agreements between Operator and any third party, and shall apply regardless of whether Broadcaster assumes or accepts assignment of any such agreements.**

(*Id.*, Ex. 3 § 19 (emphasis added).)

Notwithstanding Section 19 of the Mission Agreement, Super Towers and WNAC *twice* represented to Cox on November 5, 2020, and on November 16, 2020, that they would comply with Section 18(b) of the WNAC Agreement: they would assign to and require Mission to assume the WNAC Agreement. (*Id.* ¶¶ 31–32 & Exs. 4–5.) These representations were critical to Cox in part because the rates Cox paid to retransmit the WNAC station were lower under the WNAC Agreement than the rates under the Mission Agreement for "after-acquired stations." (*Id.* ¶ 33.) Based on these representations, Cox consented to the assignment and formally requested that Mission assume the WNAC Agreement. (*Id.* ¶ 33 & Ex. 6.)

In December 2020, Super Towers and WNAC reneged on their representations and informed Cox that *Mission* would not assume the WNAC Agreement and would instead acquire the WNAC station as an "after-acquired station" under the Mission Agreement. (*Id.* ¶ 34 & Ex. 7.) On December 29, 2020, and again on January 12, 2021, Cox wrote to Super Towers and Mission, reminding both parties that the WNAC Agreement required Super Towers and WNAC to have

Mission assume that agreement as part of its acquisition of the WNAC station at Cox's request. (*Id.* ¶¶ 35–36 & Exs. 8–9.) Cox estimated that should Super Towers breach the WNAC Agreement by failing to require Mission to assume that contract, and should Cox accordingly need to pay Mission for the WNAC retransmissions at the higher rate under the Mission Agreement, then Cox may be forced to pay an *additional* $4,000,000.00 plus interest through February 28, 2023—*i.e.*, the end of the term of the WNAC Agreement—for exactly the same retransmission consent rights to which it was entitled under the WNAC Agreement. (*Id.* ¶ 36 & Ex. 9.)

On January 18, 2021, Mission responded to Cox and rejected Cox's position that Mission must assume the WNAC Agreement as part of its acquisition of the WNAC station. (*Id.* ¶ 37 & Ex. 10.) Mission asserted instead that "the Mission Agreement, to which Cox is a party, governs any retransmission of subsequently-acquired Super Towers, LLC stations and entities by Cox." (*Id.*, Ex. 10.) Mission also asserted that "Mission will proceed with its current plans to acquire certain assets of Super Towers without acquiring or assuming any retransmission agreements between Cox and Super Towers." (*Id.*) Super Towers and WNAC neither responded in writing to Cox's breach notice nor notified Cox of the closing date, as they had promised. (*Id.* ¶ 38.)

Effective June 16, 2021, Super Towers and WNAC transferred interest in the WNAC station to Mission. (*Id.* ¶¶ 39–40 & Exs. 11–12.) Mission continues to maintain that as of June 16, 2021, Cox's retransmission of the WNAC station is subject to the Mission Agreement, including its higher rates. (*Id.* ¶ 39 & Ex. 11.) Both retransmission agreements provide that the owner of the WNAC station must consent to Cox's re-broadcasting or else Cox will violate the station's copyrights. (*See, e.g.*, Ex. 1 § 10; Ex. 3 § 6(a).) Cox's next scheduled payment—the first since transferring the WNAC station—is due August 16, 2021. (*Id.* ¶¶ 40, 42.) But Defendants will not agree to terms related to the payment or indemnity, despite multiple requests. (*Id.* ¶¶ 38, 42–44.) Nor has any party terminated the WNAC Agreement. (*Id.* ¶ 12 & Ex. 1 § 18.)

IV.   <u>**ARGUMENT**</u>

A.   **An Actual Controversy Requires Declaratory Judgment.**

As outlined above, Cox meets the standard for declaratory judgment because "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" relief. *Maryland Casualty Co.*, 312 U.S. at 273; *see also Genentech*, 549 U.S. at 127. The Supreme Court requires that the controversy "be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Genentech*, 549 U.S. at 127.

Here, Cox and Defendants have adverse legal interests: Defendants contend that they did not have to assign the WNAC Agreement to Mission, that Defendants need not indemnify and hold harmless Cox, and that Cox's retransmission of the copyrighted material without adhering to the higher rates of the Mission Agreement is an infringement of the WNAC station's copyrights. Conversely, Cox contends that Defendants had to assign the WNAC Agreement to Mission, that Cox has a right to retransmit the copyrighted material under the WNAC Agreement at its lesser rate, and that Defendants must indemnify and hold harmless Cox for any claims or losses arising from their failure to assign and to require Mission to assume and agree to the WNAC Agreement.[1]

These adverse interests are definite and concrete. Cox does not seek an advisory opinion on hypothetical facts. The facts are real and at issue. And where, as here, the "dispute relates to

---

[1] Cox also anticipates that if it pays the higher rates, Defendants will argue the payment is an admission by Cox and the voluntary payment doctrine bars recovery. *See W. Nat. Gas Co. v. Cities Serv. Gas Co.*, 201 A.2d 164, 169 (Del. 1964) ("[P]ayment voluntarily made with full knowledge of the facts cannot be recovered, in the absence of a contract to repay. A payment under protest is not necessarily involuntary, nor is it made so by unilaterally calling it involuntary at the time of payment." (citations omitted)). Defendants will not agree to any terms related to this payment.

legal rights and obligations arising from [] contracts" and the parties have previously "taken adverse positions with respect to their existing obligations," the "dispute is manifestly susceptible of judicial determination." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 242 (1937) (determining declaratory judgment in dispute on entitlement to disability benefits and obligation to pay premiums under insurance contracts). Likewise, whether conduct infringes on a copyright equally gives rise to a justiciable controversy admitting of declaratory relief. *See, e.g.*, *Genentech*, 549 U.S. at 127 ("The factual and legal dimensions of the dispute are well defined[.]").

Thus, this Court should declare the parties' rights and other legal relations under the Declaratory Judgment Act because an actual controversy requires declaratory judgment.

### B.    Declaratory Judgment Is Proper Under the WNAC Agreement.

Declaratory judgment likewise is appropriate because this contract interpretation dispute turns on questions of law that the Court should resolve. *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017) ("The proper construction of any contract . . . is purely a question of law").[2] Where, as here, the contract is unambiguous, the court should decide its proper interpretation and enforce the contract according to its terms. *See Great Clips, Inc. v.*

---

[2] "To determine the applicable substantive law, the federal court applies the choice-of-law principles of the forum state, here, Massachusetts." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). The Court should then "determine whether there is an actual conflict between the substantive law of the interested jurisdictions." *Id.* "Massachusetts applies a 'functional approach' to choice of law,'" which is "explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." *Id.* at 74 (citations omitted). According to the Restatement, the applicable state here "is the state with the most significant relationship to the contract and the parties with respect to the issue of assignability." Restatement (Second) of Conflict of Laws § 208 (1971). That state "will usually, but need not necessarily, also be the state whose local law would be applied to determine other issues relating to the contract." *Id.* Here, that state is Delaware: the WNAC Agreement, and its assignability provision, "shall be construed in accordance with the laws of the State of Delaware." (Tygh Decl., Ex. 1 § 20.) The Mission Agreement "will be governed by and construed under and in accordance with the laws (*excluding the choice of law provisions*) of the State of New York . . . ." (Tygh Decl., Ex. 3 § 17 (emphasis added).) Thus, Massachusetts choice-of-law principles require the applicability of Delaware substantive law, even if there is a conflict.

*Hair Cuttery of Greater Bos., L.L.C.*, No. CIV.A 08-CV-10959-DP, 2009 WL 458554, at *3 (D. Mass. Feb. 18, 2009), *aff'd*, 591 F.3d 32 (1st Cir. 2010); *see also W. Nat. Gas Co.*, 223 A.2d at 383–84; *Greggo v. Wohl*, 241 A.2d 522, 523 (Del. 1968); *Novellino v. Life Ins. Co. of North Am.*, 216 A.2d 420, 423 (Del. 1966).

### 1.     The WNAC Agreement Requires Defendants to Assign.

The core of this dispute is whether Defendants were required to assign the WNAC Agreement. The plain and unambiguous language in the assignment provision of the WNAC Agreement makes clear they were. Any objective, reasonable person reading the terms would understand assignment was required, and in fact Defendants have not offered a way to read the WNAC Agreement that supports their view that it was not required. Because that provision unambiguously forecloses Defendants' position, the Court need not resort to extrinsic evidence. In any event, even if extrinsic evidence were needed to decide this dispute, the evidence confirms that Defendants had to assign the agreement.

**The WNAC Agreement.** Section 18(b) of the WNAC Agreement makes clear that Super Towers and WNAC—at Cox's request—had to require Mission (as the "Station Transferee") to assume and agree to the WNAC Agreement, "regardless of whether Operator [Cox] has a separate retransmission consent agreement in effect" with a Station Transferee, "regardless of any conflicting 'after-acquired station' language" in any such agreement, "regardless of which agreement was signed later," and "regardless of any conflicting provision in such other agreement that purports to supersede conflicting provisions in other agreements." (Tygh Decl., Ex. 1 § 18(b).)

That plain text should be the beginning and end of the analysis. "It is well settled that if the terms of a contract are clear, the court must accord the language its ordinary meaning." *ThoughtWorks, Inc. v. SV Inv. Partners, LLC*, 902 A.2d 745, 752 (Del. Ch 2006); *see also GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (same); *W.*

*Nat. Gas Co.*, 223 A.2d at 383–84 (affirming summary judgment after finding contract had only one reasonable meaning); *Greggo*, 241 A.2d at 523 (affirming summary judgment where provisions at issue were unambiguous and thus parol evidence unnecessary); *Novellino*, 216 A.2d at 423 (affirming summary judgment where contract language was plain on its face).

Defendants are especially bound to the plain language because the WNAC Agreement was negotiated between sophisticated parties with legal counsel. "Requiring parties to live with the language of the contracts they negotiate holds even greater force when, as here, the parties are sophisticated entities that bargained at arm's length." *Universal Enter. Grp., L.P. v. Duncan Petroleum Corp.*, No. CIV.A. 4948-VCL, 2014 WL 1760023, at *8 (Del. Ch. Apr. 29, 2014) (citations omitted). Super Towers has been in business since 1994 and existed to operate the WNAC station through its subsidiary, WNAC. (Tygh Decl., ¶ 24.) Super Towers and WNAC by law had to renew their retransmission agreements periodically, typically every three years, and WNAC has sued for failure to abide by a retransmission consent agreement. (*Id.*; *see also* Compl., *WNAC LLC v. Verizon et al.*, No. 1:21-cv-10750 (D. Mass. May 6, 2021).) In 2017, Cox negotiated the WNAC Agreement with Defendants' counsel, a sophisticated and experienced attorney in negotiating retransmission consent agreements who has represented other clients in retransmission consent negotiations with Cox. (Tygh Decl., ¶ 23.) There is no question that Super Towers, WNAC, and their legal counsel were familiar with retransmission consent agreements when they negotiated and entered into the plain terms of the WNAC Agreement.

Moreover, Defendants' choice to sell to Mission does not, and cannot, void these terms because this Court is obligated "to fulfill the parties' shared expectations at the time they contracted." *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (citations and marks omitted). Mission is a stranger to this contract, and its agreement is extrinsic. The WNAC Agreement alone defines Defendants' and Cox's expectations in plain language.

(Tygh Decl., Ex. 1 § 18(b); *id.* § 20 ("This Agreement constitutes the entire agreement and understanding between the parties with regard to the subject matter hereof …").

At bottom, Defendants have offered no way to read the WNAC Agreement that supports their view that assignment was not required. And no reasonable, objective person would ever read the terms in a way they claim. Nor can they erase the plain and unambiguous terms that assignment must occur *at Cox's request* and *regardless* of any provisions in any other retransmission consent agreement. That language forecloses their argument. Thus, the plain terms require a declaratory judgment that Defendants were required to assign the WNAC Agreement.

**Extrinsic Evidence.** Rather than analyze the plain language of the WNAC Agreement, Defendants may invoke extrinsic evidence as if it could somehow change the agreement. Defendants cannot rewrite unambiguous language that they—sophisticated, counseled parties— now want to circumvent. *DeLucca v. KKAT Mgmt., L.L.C.*, No. CIV.A. 1384-N, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006) ("[I]t is not the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not. Rather, it is the court's job to enforce the clear terms of contracts").

In any event, the extrinsic evidence confirms that Defendants had to assign the WNAC Agreement upon their sale of the WNAC station. Even if "the dispute turns upon questions of fact," that "does not withdraw it . . . from judicial cognizance" under the Declaratory Judgment Act. *Aetna Life Ins.*, 300 U.S. at 242. This Court may find the facts necessary "to determine the legal consequences" of the contractual provisions and "the obligations of the parties corresponding to those facts." *Id.* While unnecessary in view of the plain text of the WNAC Agreement, this Court may look to the extrinsic evidence presented—the correspondence between the parties leading up to Mission's acquisition of the WNAC station, the Mission Agreement, the negotiations surrounding the WNAC Agreement, and industry custom—to declare the rights and obligations of

the parties. That evidence leaves no question that Defendants had to assign the WNAC Agreement upon Mission's purchase of the WNAC station.

**Defendants' Representations.** In 2020, as Defendants negotiated to sell their interest to Mission, Defendants confirmed their *own* understanding of the assignment terms with Cox and promised they would assign the WNAC Agreement to Mission. (Tygh Decl., ¶¶ 31–32 & Exs. 4–5.) In their November 5, 2020 letter, Defendants represented to Cox that they intended to comply with their obligations under Section 18(b) of the WNAC Retransmission and that on the closing date of the transaction they intended to assign to Mission the WNAC Retransmission Agreement. (*Id.* ¶ 31 & Ex. 4.) On November 16, 2020, Defendants again represented to Cox that as part of the closing they would assign to Mission, and Mission would assume, the WNAC Retransmission Agreement. (*Id.* ¶ 32 & Ex. 5.) Defendants' representations to Cox leave no doubt that Defendants understood their own expectations that they had to assign the WNAC Agreement.

**The Mission Agreement.** The Mission Agreement unsurprisingly confirms this result. When, as here, any conflict exists between the contracts, the agreement adopted later in time controls. *See, e.g.*, *Cabela's LLC v. Wellman*, No. CV 2018-0607-TMR, 2018 WL 5309954, at *5 (Del. Ch. Oct. 26, 2018).[3] Here, the Mission Agreement was entered into on December 28, 2018. (Tygh Decl., ¶ 29 & Ex. 3.) The WNAC Agreement was re-adopted, by its amendment and extension, on February 11, 2020. (*Id.*, Ex. 2.) The provisions of Section 18 remained during negotiations and reaffirmation of the WNAC Agreement. (*Id.* ¶ 28 & Ex. 2) Thus, Section 18 of the WNAC Agreement controls over any conflicting provision in Section 19 of the Mission

---

[3] As noted above, the WNAC Agreement is construed under Delaware law. Tygh Decl., Ex. 1 § 20. Even if New York law applied (as referenced in the Mission Agreement), New York follows the same contract interpretation principle. *See, e.g.*, *A & E Television Networks, LLC v. Pivot Point Ent., LLC*, No. 10 CIV. 09422 AJN, 2013 WL 1245453, at *10 (S.D.N.Y. Mar. 27, 2013).

Agreement, and Sections 18 and 20 of the WNAC Agreement make clear that it supersedes other agreements. *See Cabela's*, 2018 WL 5309954, at *5 (contract entered into on later date prevails over conflicting agreement); *Pivot Point Ent.*, 2013 WL 1245453, at *10 (same).

Additionally, the relevant provision of the WNAC Agreement is more specific than the corollary provision in the Mission Agreement. Section 19 of the Mission Agreement is a general "after-acquired station" provision: it states that, upon acquisition of a station, the Mission Agreement shall control notwithstanding conflicting provisions in "any agreements between Operator and any third party." (Tygh Decl., Ex. 3 § 19.) Conversely, Section 18(a) of the WNAC Agreement states that the buyer must assume and abide by its terms "regardless of whether Operator [Cox] has a retransmission consent agreement in effect with such Station Transferee for the carriage of other broadcast television signals," "regardless of any conflicting 'after-acquired station' language contained therein to the contrary," and that its terms "shall supersede any conflicting provision in any such other retransmission consent agreement, regardless of which agreement was signed later and regardless of any conflicting provision in such other agreement that purports to supersede conflicting provisions in other agreements." (*Id.*, Ex. 1 § 18(b).)

"Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *See DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 960–61 (Del. 2005) (affirming trial court's ruling that specific provision both conflicted with and governed over general provision).[4] The specificity of Section 18(b) of the WNAC Agreement leaves no doubt that it was intended to supersede more generic provisions in pre-existing retransmission agreements—and particularly

---

[4] Again, New York applies the same contract interpretation principle. *See, e.g.*, *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) (for any "inconsistency between a specific provision and a general provision of a contract . . ., the specific provision controls").

"after-acquired station" clauses—such as the Mission Agreement.

Finally, this Court should give effect to all the terms and read them in a way that, if possible, reconciles them. *See Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 386 (Del. 2012). Here, the WNAC Agreement added a critical term and avoided inconsistency by requiring assignment at "Operator's [Cox's] request." (Tygh Decl., Ex. 1 § 18(b).) The Mission Agreement includes no such term. (*Id.*, Ex. 3 § 19.) That key term is why Defendants *themselves* requested assignment to Mission, and Cox demanded and consented to the assignment. (*Id.* ¶¶ 31–33 & Exs. 4–6.) Thus, the WNAC Agreement and Mission Agreement may be harmonized because the Defendants' assignment obligation explicitly turned on Cox's request. Defendants' interpretation would destroy that key term and the parties' understanding.

**Industry Custom.** Industry custom also confirms that Defendants had to assign the WNAC Agreement. At the time Cox and Defendants entered into the WNAC Agreement in 2017, and when they amended and extended it in 2020, Defendants and their counsel knew that both "after-acquired station" and assignment and assumption clauses were common in the industry. (*Id.* ¶¶ 7–9, 23–28.) This is especially true in recent years, as the broadcast industry consolidates, and owners alternatively grow or liquidate their television station portfolios. (*Id.* ¶ 8.) Accordingly, the purpose of both "after-acquired station" and assignment clauses in retransmission consent agreements is to ensure that only one retransmission consent agreement governs the broadcast station at issue, to avoid the inconvenience of renegotiating the agreement every time a station changes ownership, and to ensure certainty about which agreement applies following a change in ownership. (*Id.* ¶ 9.)

In the WNAC Agreement, the parties agreed to a favorable provision for Cox that plainly made assignment of the agreement Cox's choice in Section 18(b). That choice gave Cox the right to avoid "after-acquired station" provisions in any existing retransmission agreement between Cox and a would-be purchaser. The parties also included the "regardless" clauses in Section 18(b) so

that there would be no confusion that the WNAC Agreement prevails over more general "after-acquired station" provisions, should the WNAC station be sold to a broadcaster with whom Cox already had an agreement. Defendants' interpretation would eviscerate these bargained-for terms and contradict the industry purpose of both "after-acquired station" and assignment clauses. *See Playtex FP, Inc. v. Columbia Cas. Co.*, 622 A.2d 1074, 1076 (Del. Super. Ct. 1992) ("The court should consider the overall purpose of the contracts and of the specific provisions at issue. An understanding of the industry is also important to an intelligent interpretation of the meaning of a contract" (citations omitted)).

**Negotiations.** This industry custom is reflected in the parties' negotiations over the 2017 WNAC Agreement and its 2020 renewal, which likewise confirm the parties' expectations when they agreed to Section 18(b). Because of the prevalence of "after-acquired station" provisions in the industry, Mr. Tygh proposed Section 18(b) in the WNAC Agreement as favorable terms for Cox during the 2017 negotiations, and Mr. Goodman accepted the proposal. (Tygh Decl., ¶ 27.) That assignment provision reflected the parties' bargaining positions at the time. (*Id.*) Consistent with those facts, Mr. Goodman did not seek to amend or omit Section 18(b) in the WNAC Agreement, while he pushed back on and modified other terms. (*Id.*) During the 2020 renewal negotiations, Defendants' counsel likewise did not request any amendments to Section 18(b), which was left unchanged from the 2017 agreement. (*Id.* ¶ 28.)

When, as here, sophisticated parties have not only negotiated but also renewed an arms' length agreement, they must be held to the plain terms of their bargain. For example, in *Chrysler Corp. v. Quimby*, the court enforced a contract against a party who could have "taken steps to protect himself" from a disputed clause of the contract but instead "he chose to take a chance on renewal." 144 A.2d 885, 887–88 (1958); *see also CSH Theatres, LLC v. Nederlander of San Francisco Assocs.*, No. CV 9380-VCP, 2015 WL 1839684, at *15 (Del. Ch. Apr. 21, 2015), *aff'd*

*sub nom. In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39 (Del. 2019) (less proof needed to show agreement to material terms on renewal because "both parties to a contract renewal already are familiar with the terms of the existing contract"); *Paradee Oil Co. v. Phillips Petroleum Co.*, 320 A.2d 769, 774 (Del. Ch. 1974), *aff'd*, 343 A.2d 610 (Del. 1975) (parties' renewal after passage of statute constituted "constructive knowledge" of the statute).

The bottom line is that Defendants and their sophisticated legal counsel agreed to, and did not dispute, Section 18(b) in their arms' length negotiations, as it was included in both the 2017 agreement and the 2020 renewal. Now Defendants are asking the Court to give them what they did not obtain through negotiation. The Court should reject their newest position because the WNAC Agreement in plain and ordinary language is clear they had to assign the WNAC Agreement to Mission. (Tygh Decl., Ex. 1 § 18(b).)

> ### 2.     The WNAC Agreement Remains In Effect Until February 2023.

Cox also requests a declaratory judgment from this Court that the WNAC Agreement continues in effect until February 28, 2023. As discussed above, the WNAC Agreement was amended and extended on February 11, 2020, with an expiration date of 11:59 p.m. Eastern Standard Time on February 28, 2023. No party has sought to terminate the WNAC Agreement. (Tygh Decl., ¶ 12.) Thus, this Court may simply enforce the contract terms on their face to issue a declaratory judgment that it remains in effect until February 28, 2023. *See Exelon Generation Acquisitions, LLC*, 176 A.3d at 1266–67; *see also Western Natural Gas Co.*, 223 A.2d at 383–84; *Greggo*, 241 A.2d at 523; *Novellino*, 216 A.2d at 423.

> ### 3.     Cox Has Not Infringed on WNAC's Copyright By Continuing to Retransmit the WNAC Broadcast Signal Under the WNAC Agreement.

Further, Cox seeks a declaration of non-infringement under 17 U.S.C. § 106(4), allowing Cox to continue retransmitting the WNAC station under the WNAC Agreement. Under both the

WNAC and Mission Agreements, as well as federal law, Cox must obtain the station's consent to retransmit its signal. As described above, Cox bargained for and obtained that consent, as reflected in the WNAC Agreement. (Tygh Decl., ¶ 14 & Ex. 1 § 3(a).)

Because of Defendants' failure to assign the WNAC Agreement, Cox risks claims for copyright infringement if Cox continues to retransmit the WNAC station under the terms of the WNAC Agreement. By its terms, however, the WNAC Agreement remains in effect and therefore continues to define Cox's rights and obligations with respect to the WNAC station. (*Id.*, Ex. 1 § 2.) And no party has sought to terminate the WNAC Agreement. (*Id.*, ¶ 12.)

Therefore, should this Court issue a declaratory judgment that Defendants had to assign the WNAC Agreement when Mission acquired the WNAC station (*supra* § IV.B), this Court should issue a declaratory judgment that Cox's retransmission of the WNAC station broadcast signal under the terms of the WNAC Agreement does not infringe on the WNAC station copyright.

### 4. Defendants Must Indemnify and Hold Harmless Cox Against Any Losses Arising Out of the WNAC Retransmission Agreement.

Lastly, Cox seeks a declaratory judgment that Defendants must indemnify and hold harmless Cox under the WNAC Agreement. Section 14(a) makes plain that Defendants shall indemnify and hold harmless Cox against any losses (including reasonable attorneys' fees) arising from, or in connection with, the breach by Super Towers and WNAC of any of its covenants, representations, warranties, or agreements contained in the WNAC Agreement:

14.   Indemnification.

(a)   Broadcaster [Super Towers and WNAC] shall indemnify and hold harmless Operator [Cox], each Operator Entity, each System, and the officers, directors, employees, shareholders, members, representatives and other agents of each from and against any third-party claims, liability, causes of action, and costs (including reasonable attorneys' fees) ("Losses") arising from, or in connection with, (i) the breach by Broadcaster [Super Towers and WNAC] of any of its covenants, representations, warranties or agreements contained herein and/or (ii) any programming or other content provided by Broadcaster [Super Towers and WNAC]

19

pursuant to or in connection with this Agreement, including, but not limited to, any suit or proceeding for libel, slander, defamation, invasion of property or privacy rights, or violation of trademark, patent, copyright or other intellectual property rights.

(*Id.*, Ex. 1 § 14.)

Under the plain language of Section 14(a), Cox has demanded that Defendants indemnify and hold harmless Cox. (*Id.* ¶ 44 & Ex. 15.) That loss would include any disputed difference in the monthly license fee coming due on August 16, 2021. (*Id.*) But Defendants have not agreed to indemnify Cox and will not agree to terms for the August 16 payment or indemnity, putting Cox in the untenable position of either (1) paying the lesser amount to Mission and risking further claims, or (2) paying the higher amount for Defendants' failure to assign to Mission.[5] The simple truth is that Defendants do not want to negotiate.

Thus, as discussed above in relation to Section 18, this Court may declare the parties' respective indemnity obligations and rights under Section 14(a) based on the four corners of WNAC Agreement. *See Exelon Generation Acquisitions*, 176 A.3d at 1266–67; *Western Natural Gas Co.*, 223 A.2d at 383–84; *Greggo*, 241 A.2d at 523; *Novellino*, 216 A.2d at 423.

## V.    **CONCLUSION**

For these reasons, Cox respectfully requests that this Court grant the Motion for Declaratory Judgment.

---

[5] As noted above, Cox anticipates that if it pays the higher rates, Defendants will argue the payment is an admission by Cox and the voluntary payment doctrine bars recovery. But Defendants will not agree to any terms related to this payment. *See supra* n.1.

Dated: August 2, 2021                    Respectfully submitted,

                                         */s/ Brian O. Watson*
                                         Patricia Brown Holmes (*pro hac vice*)
                                         Brian O'Connor Watson (*pro hac vice*)
                                         Allison N. Siebeneck (*pro hac vice*)
                                         Jeffrey W. Gordon
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         70 W. Madison Street, Suite 2900
                                         Chicago, IL 60602
                                         (312) 471-8700
                                         pholmes@rshc-law.com
                                         bwatson@rshc-law.com
                                         asiebeneck@rshc-law.com
                                         jgordon@rshc-law.com

                                         *Counsel for CoxCom, LLC,*
                                         *d/b/a Cox Communications*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on August 2, 2021, the foregoing document was electronically filed using the Court's CM/ECF system, which will automatically send email notification of such filing to all attorneys of record and will likewise be available electronically to any attorneys of record who appear in this matter.

/s/ *Brian O. Watson*
Counsel for Plaintiff CoxCom, LLC,
d/b/a Cox Communications
