**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COXCOM, LLC, d/b/a COX
COMMUNICATIONS,

       Plaintiff,

    v.

SUPER TOWERS, INC., and
WNAC, LLC,

       Defendants.

Case No. 1:21-cv-11124-DJC

**DECLARATION OF CHRIS TYGH IN SUPPORT OF
MOTION FOR DECLARATORY JUDGMENT**

I, Chris Tygh, declare that I have personal knowledge of the facts stated in this declaration and if called as a witness I could and would testify competently to them under oath.

**I.    BACKGROUND**

1.      At all relevant times, I have been the Vice President of Content Acquisition at Plaintiff CoxCom, LLC, d/b/a Cox Communications ("Cox").

2.      I received my J.D. from the George Washington University Law School in 2003. I joined private practice at Akin Gump Strauss Hauer & Feld LLP in June 2004. At Akin Gump, I worked on legal matters involving broadcasting, cable, satellite, and telecom industries. Since then, I have worked at several other large national and international law firms—Sheppard Mullin Richter & Hampton LLP, and Covington & Burling—and continued to work in the broadcasting, cable, satellite, and telecom industries. Specifically, my practice included (and still includes) negotiating retransmission consent agreements.

3.      In 2011, I went in-house to work as an assistant general counsel at Raycom Media. I continued to manage and negotiate hundreds of retransmission consent agreements.

4.     In 2014, I joined Cox as an Executive Director of Content Acquisition. In December 2015, I was promoted to Vice President, Content Acquisition, a position I hold to this day. In both positions at Cox, I have continued to negotiate and manage retransmission consent agreements and their renewals. Altogether, I have negotiated thousands of retransmission consent agreements and their renewals.

5.     I am personally familiar with Cox's practice of creating and maintaining business records. Exhibits attached to this declaration were records kept in the course of a regularly conducted business activity at Cox, were prepared as a regular practice and custom, and were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

## II.     RETRANSMISSION CONSENT AGREEMENTS

6.     Most households in the United States get their television programming by subscribing to a multichannel video programming distributor ("MVPD"), such as a cable or satellite operator, which provides subscribers with access to a variety of news, sports, and general entertainment channels, including local broadcast television stations licensed by the FCC to serve a Nielsen-defined designated market area ("DMA"). Under federal law, MVPDs must obtain stations' consent to retransmit their signals.

7.     Retransmission consent agreements allow MVPDs, such as a cable or satellite operator, and the owners of broadcast television stations to establish the terms and conditions for retransmission of stations' signals, including compliance with the Communications Act and the Copyright Act.

8.     Retransmission consent agreements commonly include after-acquired station and assignment provisions in the event the broadcast owner purchases or sells a television station from or to another broadcast owner through merger or acquisition, which is a common occurrence in

recent years as the broadcast industry consolidates and owners grow or liquidate their television station portfolio.

9.      After-acquired station and assignment provisions in retransmission consent agreements govern how an owner's television station(s) are treated upon the purchase or sale of a station, ensure that only one transmission consent agreement with an MVPD applies with respect to one or more television stations, avoid the inconvenience of having to renegotiate the agreement every time a station changes ownership, and ensure certainty about which agreement applies in a change in ownership. That is, a retransmission consent agreement might purport to apply to the operator of a station acquired by the broadcaster after the agreement is entered such that the acquiring broadcaster can force the operator of the acquired station to follow the rates and terms of the acquiring broadcaster's retransmission agreement—usually after a certain period of time after acquisition.

10.      As part of its business, Cox enters into retransmission consent agreements to retransmit local broadcast television stations in various markets and provides cable television, among other services, to American households and businesses within Cox's service footprint.

## III.    THE WNAC AGREEMENT

11.      The Retransmission Consent Agreement ("WNAC Agreement") between Cox, Super Towers, Inc. ("Super Towers"), and WNAC, LLC ("WNAC") was executed in February 2017, with an effective date of March 1, 2017, and later amended and extended in an Amendment to Retransmission Agreement with an effective date of February 11, 2020. A true and correct copy of the WNAC Agreement, as amended and extended, is attached to this declaration as **Exhibit 1** and **Exhibit 2**, and incorporated by reference.

12.      Neither Super Towers, WNAC, nor Cox has terminated the WNAC Agreement under the termination provisions of Section 15.  *See* Ex. 1 at 15, § 18.

3

A.      **The Plain Text of the WNAC Agreement**

13.      Under Section 2 of the WNAC Agreement, the WNAC Agreement expires at 11:59

p.m. prevailing local time (Eastern Standard Time) on February 23, 2023. *See* Ex. 1 at 3, § 2; Ex.

2 at 1, § 2.

14.      Under Section 3(a) of the WNAC Agreement, Super Towers and WNAC granted

Cox the non-exclusive right to retransmit WNAC-TV's broadcast signal in the Providence, Rhode

Island—New Bedford, Massachusetts market during the term of the WNAC Agreement:

> 3.      <u>Consent to Carriage; Signal Delivery</u>.
>
> (a)      Broadcaster [Super Towers and WNAC] hereby grants to Operator
> [Cox] the non-exclusive right (but not the obligation, except as otherwise
> provided in Section 4 below) to receive, retransmit and distribute each
> Station's Digital Signal (including any portion thereof and whether licensed
> under the current call letters or any successor call letters thereto) in an
> analog, SD or HD format, over each System that (i) serves Subscribers
> located within the applicable Station's Television Market, (ii) carries the
> Station as of the Effective Date, or (iii) is located in an area where such
> Station is deemed "significantly viewed" (as such term is defined in FCC
> Rules).

*See* Ex. 1 at 1, § 3.

15.      Under Section 9(a) of the WNAC Agreement, Super Towers and WNAC agreed

for Cox to pay a monthly license fee per subscriber in exchange for the right to retransmit WNAC-

TV's broadcast television signal:

> 9.      <u>License Fee</u>.
>
> (a)      Subject to the terms of this Section 9, Operator [Cox] shall pay a
> monthly license fee (the "License Fee") for each Top-4 Station as set forth
> in the table below. The License Fee for each such Station shall equal the
> product of the applicable monthly rate set forth below, subject to any
> adjustment in the applicable monthly rate in accordance with this Section
> 9(a), and the number of Subscribers authorized to and who do receive such
> Station from a Television Market System for the applicable month as
> calculated in Section 9(b) below. If a Station broadcasts a Multicast Feed
> affiliated with a Top-4 Network, Operator [Cox] will pay a separate License
> Fee for retransmission of such Multicast Feed. The License Fee shall be

> prorated for partial months (if any). Payment of the monthly License Fee shall be made within 45 days after the conclusion of the applicable calendar month. Included with each monthly payment shall be a monthly report indicating the aggregate number of Subscribers for the applicable Television Market Systems.

*See* Ex. 1 at 12, § 9(a).

16.     Under Section 13(a) of the WNAC Agreement, Super Towers and WNAC represented and warranted that they had and would maintain, for the term of the WNAC Agreement, the necessary rights to operate WNAC-TV and to comply with the terms of the WNAC Agreement:

> 13.     <u>Representations and Warranties</u>.
>
> (a)     <u>By Broadcaster</u>.     Broadcaster [Super Towers and WNAC] represents and warrants that: (i) it is an entity duly organized, validly existing and in good standing under the laws of the state of its formation, (ii) it has the requisite power and authority to execute and deliver this Agreement and to perform fully its obligations hereunder; (iii) it is under no contractual or other legal obligation that will interfere with its full, prompt, and complete performance hereunder; (iv) the individual executing this Agreement on behalf of Broadcaster [Super Towers and WNAC] has the authority to do so; (v) it owns, controls or manages each Station; (vi) each Station transmits a good quality, full-power digital broadcast television signal and is licensed by the FCC to operate in the Television Market set for in <u>Attachment A</u>; (vii) it has all necessary rights, licenses, consents, permissions, authorizations and permits from all relevant authorities to operate the Stations and comply with the terms of this Agreement and, during the Term, it shall continue to maintain or obtain the same; and (viii) it is in material compliance with all applicable laws and FCC rules.

*See* Ex. 1 at 16, § 13(a).

17.     Under Section 15(a) of the WNAC Agreement, Super Towers, WNAC, and Cox have the right to early termination, upon written notice, only if the other party has made a material misrepresentation or has materially breached its duties under the WNAC Agreement:

15.     Termination.

(a)     Either Broadcaster [Super Towers and WNAC] or Operator [Cox] may terminate this Agreement, effective no earlier than thirty (30) days after written notice to the other party, if the other has made a material misrepresentation or has materially breached its duties or obligations hereunder, and such misrepresentation or breach is not cured within fifteen (15) days of such notice; provided, that if such breach is confined to a System and/or Station, or to a limited number of Systems and/or Stations, then the non-breaching party shall have the right to terminate this Agreement only as to the affected System(s) and/or Stations; and, provided, further, that if such breach giving rise to the right of termination cannot reasonably be cured within fifteen (15) days, but the party seeking to cure such breach has commenced good-faith efforts to cure such breach, then the cure period shall be extended for an additional fifteen (15) days.

See Ex. 1 at 18, § 15(a).

18.     Under Section 18(b) of the WNAC Agreement, if Super Towers and/or WNAC sell, transfer, assign, or otherwise dispose of its ownership interest in one or more stations to a third party (defined as a "Station Transferee"), then at Cox's request, Super Towers and WNAC shall require the Station Transferee to assume the WNAC Agreement, to agree to abide by the terms through the remainder of the term, and to agree that the terms supersede any conflicting provision in any other retransmission consent agreement:

18.     Assignments: Divested Systems and Stations.

(b)     This Agreement may not be assigned by Broadcaster [Super Towers and WNAC] without the prior written consent of Operator [Cox], which consent shall not be unreasonably withheld, conditioned or delayed: provided, that Broadcaster [Super Towers and WNAC] may assign this Agreement without the consent of Operator [Cox] (but upon prior written notice to Operator [Cox]) to (i) any Broadcaster Entity, or (ii) any entity acquiring all or substantially all of the assets of Broadcaster [Super Towers and WNAC] or any Station(s); provided, further, that any assignee assumes all of Broadcaster's [Super Towers and WNAC's] obligations arising hereunder with respect to the applicable Station(s). In the event of any valid assignment of this Agreement by Broadcaster [Super Towers and WNAC], Broadcaster [Super Towers and WNAC] shall be relieved of all obligations arising thereafter and Operator [Cox] shall look solely to the assignee for enforcement of such obligations. Notwithstanding the foregoing, if

6

> Broadcaster [Super Towers and WNAC] sells, transfers, assigns or otherwise disposes of its ownership interest in one or more Stations to a third party (the "Station Transferee"), then at Operator's [Cox's] request, Broadcaster [Super Towers and WNAC] shall require such Station Transferee (i) to assume this Agreement with respect to such Station(s) and the applicable terms and conditions hereof and agree to abide by the terms hereof through the remainder of the Term, regardless of whether Operator [Cox] has a retransmission consent agreement in effect with such Station Transferee for the carriage of other broadcast television signals (and regardless of any conflicting "after-acquired station" language contained therein to the contrary, and (ii) to agree that the terms herein shall supersede any conflicting provision in any such other retransmission consent agreement, regardless of which agreement was signed later and regardless of any conflicting provision in such other agreement that purports to supersede conflicting provisions in other agreements[.]

*See* Ex. 1 at 21, § 18(b).

19.     By the plain terms in Section 18(b) of the WNAC Agreement, Super Towers and WNAC shall require a Station Transferee at Cox's request to assume and agree to the WNAC Agreement, "regardless of whether Operator [Cox] has a separate retransmission consent agreement in effect" with a Station Transferee, "regardless of any conflicting 'after-acquired station' language" in any such agreement, "regardless of which agreement was signed later," and "regardless of any conflicting provision in such other agreement that purports to supersede conflicting provisions in other agreements."

20.     Cox, Super Towers, and WNAC included the specific provisions in Section 18(b) of the WNAC Agreement—including the terms "regardless of whether Operator [Cox] has a separate retransmission consent agreement in effect" with a Station Transferee, "regardless of any conflicting 'after-acquired station' language" in any such agreement, "regardless of which agreement was signed later," and "regardless of any conflicting provision in such other agreement that purports to supersede conflicting provisions in other agreements"—over more general provisions in other retransmission agreements.

7

21.     Under Section 14(a) of the WNAC Agreement, Super Towers and WNAC shall indemnify and hold harmless Cox against any third-party claims, liability, causes of action, and costs (including reasonable attorneys' fees) arising from, or in connection with, the breach by Super Towers and WNAC of any of its covenants, representations, warranties, or agreements contained in the WNAC Agreement:

> 14.     Indemnification.
>
> (a)     Broadcaster [Super Towers and WNAC] shall indemnify and hold harmless Operator [Cox], each Operator Entity, each System, and the officers, directors, employees, shareholders, members, representatives and other agents of each from and against any third-party claims, liability, causes of action, and costs (including reasonable attorneys' fees) ("Losses") arising from, or in connection with, (i) the breach by Broadcaster [Super Towers and WNAC] of any of its covenants, representations, warranties or agreements contained herein and/or (ii) any programming or other content provided by Broadcaster [Super Towers and WNAC] pursuant to or in connection with this Agreement, including, but not limited to, any suit or proceeding for libel, slander, defamation, invasion of property or privacy rights, or violation of trademark, patent, copyright or other intellectual property rights.

*See* Ex. 1 at 16-17, § 14(a).

22.     Under Section 20 of the WNAC Agreement, Cox, Super Towers, and WNAC agreed their entire agreement and understanding were contained in the WNAC Agreement:

> This Agreement constitutes the entire agreement and understanding between the parties with regard to the subject matter hereof, and supersedes all prior or contemporaneous oral or written agreements and representations between the parties, including, without limitation, all other amendments, term sheets, and other agreements between Operator [Cox] or an Operator Entity and Broadcaster [Super Towers and WNAC] or a Broadcaster Entity . . . .

*See* Ex. 1 at 21, § 20.

B.      **The Negotiations of the WNAC Agreement**

23.      In 2017, I negotiated the WNAC Agreement with Jack Goodman, who represented Super Towers and WNAC. Mr. Goodman and I have negotiated other retransmission consent agreements, and I consider Mr. Goodman to be sophisticated in the negotiation process of retransmission consent agreements.

24.      I understand that Super Towers operated WNAC-TV through its subsidiary, WNAC, and that Super Towers boasts of having been in business since 1994. As part of their operations, Super Towers and WNAC would be required by law to renew their retransmission agreements periodically, typically every three years. WNAC also has sued entities such as Verizon for failure to abide by a retransmission consent agreement. In my experience, these entities and individuals are sophisticated in business dealings, particularly the negotiation and renewal of retransmission consent agreements.

25.      I have negotiated other retransmission consent agreements with Mr. Goodman in his representation of other station owners, and as discussed above it is well-known in the industry that stations are commonly sold to new station owners who have existing retransmission agreements with cable operators like Cox.

26.      At the time of negotiations, I also was involved in establishing and meeting the budget for Cox's retransmission consent deals, and it was a crucial component of Cox's bargaining position that any agreement to retransmit WNAC-TV guarantee that any future station purchaser would be bound by the terms of the WNAC Agreement, including that agreement's rates, for its entire term, not any pre-existing agreement Cox may have had with that owner for other stations.

27.      Because of these facts, I proposed the language of Section 18(b) as favorable terms for Cox, and Mr. Goodman accepted the proposal without change. Mr. Goodman did not claim the terms were (or would be) unenforceable, and he has agreed to the terms in another retransmission

9

consent agreement with Cox. Mr. Goodman pushed back on and modified other terms in the agreement, however. My understanding of Super Towers and WNAC's negotiating position with Cox at the time was that WNAC-TV was not for sale and would not be for sale in the near future. Consistent with that view, Section 18(b) was successfully negotiated for Cox and agreed to by Super Towers and WNAC in the WNAC Agreement.

28.     In February 2020, I negotiated an amendment and extension to the WNAC Agreement with Mr. Goodman and an attorney for Super Towers, Chris Sullivan. Mr. Sullivan and I exchanged redline copies on February 3 and February 10, 2020. Mr. Sullivan did not try to change Section 18(b) from the 2017 agreement, and I kept Section 18(b) as favorable terms for Cox from the 2017 agreement. The parties agreed to a final version and amended and extended the WNAC Agreement on February 11, 2020.

## IV.     THE DISPUTE WITH SUPER TOWERS AND WNAC

### A.     The Mission Sale

29.     On November 5, 2020, Super Towers and WNAC informed Cox that Super Towers intended to assign the FCC broadcast license and sell its ownership interest in WNAC-TV to Mission Broadcasting, Inc. ("Mission"). In an unrelated and separate transaction, Cox had entered into a retransmission agreement with Mission on December 28, 2018—i.e., after the WNAC Agreement was originally entered, but before it was amended and extended—to retransmit the broadcast signal of other TV stations owned by Mission ("Mission Agreement"). A true and correct copy of the Mission Agreement is attached to this declaration as **Exhibit 3** and incorporated by reference.

30.     Section 19(c) of the Mission Agreement includes an "after-acquired station" clause:

> Except as otherwise provided below, for the avoidance of doubt, the provisions of this Section 19 shall control all retransmission of television stations acquired by Broadcaster . . . after the date hereof on all Eligible

Systems owned, built or acquired by Operator during the term **notwithstanding any conflicting provisions contained in any agreements between Operator and any third party, and shall apply regardless of whether Broadcaster assumes or accepts assignment of any such agreements.**

Ex. 3 at 17, § 19(c) (emphasis added).

### B. Super Towers' and WNAC's Representations to Cox

31.     In their letter dated November 5, 2020, Super Towers and WNAC represented to Cox that they understood and intended to comply with their obligations under Section 18(b) of the WNAC Agreement: they stated that on the closing date of the transaction Super Towers (and its wholly owned subsidiary, WNAC) intends to assign to Mission the WNAC Agreement. A true and correct copy of the November 5, 2020 letter is attached to this declaration as **Exhibit 4** and incorporated by reference.

32.     In a letter dated November 16, 2020, Super Towers and WNAC again represented to Cox that they would comply with Section 18(b) of the WNAC Agreement: they stated that would assign to Mission and require Mission to assume the WNAC Agreement as part of its acquisition of WNAC-TV. A true and correct copy of the November 16, 2020 letter is attached to this declaration as **Exhibit 5** and incorporated by reference.

33.     Consistent with Defendants' representations, I also understood that Section 18(b) of the WNAC Agreement required Super Towers and WNAC to assign the agreement to Mission. The WNAC Agreement included specific terms that assignment must occur at Cox's request and regardless of other provisions in other retransmission consent agreement. Defendants' representations were also critical to Cox in part because the rates Cox paid to retransmit WNAC-TV were lower under the WNAC Agreement than the rates due under the Mission Agreement for "after-acquired stations." Based on Defendants' representations, and my understanding of the WNAC Agreement and Mission Agreement, Cox consented to the assignment and formally

11

requested that Mission assume the WNAC Agreement in a December 10, 2020 letter. A true and correct copy of the December 10, 2020 letter is attached to this declaration as **Exhibit 6** and incorporated by reference.

34.     On December 18, 2020, Mr. Sullivan, on behalf of Super Towers and WNAC, sent Cox another letter. In this letter, Mr. Sullivan now stated that Mission had informed Super Towers and WNAC that WNAC-TV will constitute an "after-acquired" station under the Mission Agreement—i.e., that Mission would not be assigned or assume Defendants' obligations under the WNAC Agreement. A true and correct copy of the December 18, 2020 letter is attached to this declaration as **Exhibit 7** and incorporated by reference.

35.     On December 29, 2020, via outside counsel, Cox sent a letter to Super Towers and Mission, notifying them that consummating the sale "absent the assignment to and assumption of the WNAC RTC Agreement by Mission will constitute a breach by Super Towers of the WNAC RTC Agreement. Cox further notifies Mission that its refusal to assume the WNAC RTC Agreement . . . will constitute tortious interference with the obligations of Super Towers under the WNAC RTC Agreement." The December 29 letter reiterated the assignment and assumption obligations under Section 18(b) of the WNAC Agreement and that it superseded the Mission Agreement "regardless of any conflicting provisions therein that purport to supersede the WNAC RTC Agreement." The December 29 letter also proposed a meeting to resolve the dispute. A true and correct copy of the December 29, 2020 letter is attached to this declaration as **Exhibit 8** and incorporated by reference.

36.     On January 12, 2021, Cox's outside counsel sent a letter to Super Towers and Mission, notifying them that breach of the WNAC Agreement would cause estimated minimum damages through February 28, 2023 (i.e., the remaining term of the Agreement) of approximately

$4,000,000.00 in increased licensing fees. The January 12 letter again proposed a meeting to resolve the dispute. A true and correct copy of the January 12, 2021 letter is attached to this declaration as **Exhibit 9** and incorporated by reference.

37.     On January 18, 2021, Mission's outside counsel sent a letter to Cox's outside counsel in response to the December 29 letter. Mission affirmed its position that Cox is bound by the Mission Agreement, Section 18(b) of the WNAC Agreement is not enforceable against Mission, and that Section 19 of the Mission Agreement prevailed over Section 18(b) of the WNAC Agreement. The January 18 letter concluded by stating: "Mission will proceed with its current plans to acquire certain assets of Super Towers without acquiring or assuming any retransmission agreements between Cox and Super Towers." A true and correct copy of the January 18, 2021 letter is attached to this declaration as **Exhibit 10** and incorporated by reference.

38.     I received no written response from Super Towers and WNAC to Cox's breach notices of December 29, 2020 and January 12, 2021. Additionally, though Super Towers and WNAC had stated to me that WNAC would notify me when a closing date had been set, I received no such notice—until after Mission had consummated its acquisition from Super Towers of WNAC-TV. *See* **Exhibit 4**, November 5, 2020 letter.

39.     On June 18, 2021, after months of silence from Super Towers and WNAC about the sale, Mission sent a letter to Cox stating that on June 16, 2021, Mission had consummated its acquisition of WNAC-TV from Super Towers and that effective on June 16, 2021, Cox's continued carriage of WNAC-TV will now be governed by the Mission Agreement.  Mission further stated that Cox should calculate its license fees for WNAC-TV per the terms of the Mission Agreement. A true and correct copy of the June 18, 2021 letter is attached to this declaration as **Exhibit 11** and incorporated by reference.

40.     On June 21, 2021, Super Towers sent a letter to Cox that provided notice of the sale of WNAC-TV to Mission and that as of June 16, 2021, Super Towers was no longer the owner of WNAC-TV. Super Towers also stated that Cox's carriage of WNAC-TV will thereafter be subject to either the terms of Mission's Agreement with Cox, including the "'after-acquired'" station provisions thereof, or another agreement between Cox and Mission.  Super Towers further stated that Cox should continue to remit all retransmission consent fee payments due for the period up to and including June 15, 2021, including a prorated payment for June, to Super Towers and Mission will instruct Cox where to send payments related to the period after June 15, 2021. A true and correct copy of the June 21, 2021 letter is attached to this declaration as **Exhibit 12** and incorporated by reference.

41.     Should Cox be required to pay for its retransmission consent rights for WNAC-TV under the Mission Agreement, instead of the WNAC Agreement, Cox may be required to pay substantially more—approximately $4,000,000.00 plus interest by my initial estimates—to Mission for the same retransmission consent rights for WNAC-TV as Cox has under the WNAC Agreement.

      **C.**      **The Status of the Dispute with Super Towers and WNAC**

42.      Based on an email dated July 23, 2021, I understand that Super Towers and WNAC's outside counsel, Mr. Goodman, will not agree to terms related to the August 16, 2021 payment or any other alternative that will not harm Cox. A true and correct copy of the July 23, 2021 email is attached to this declaration as **Exhibit 13** and incorporated by reference.

43.     Based on an email dated July 26, 2021, I understand that Super Towers, WNAC, and Mission's outside counsel, Kirkland & Ellis, will not agree to terms related to the retransmission consent fees for WNAC-TV due to be paid on August 16, 2021. A true and correct

copy of the July 23, 2021 email is attached to this declaration as **Exhibit 14** and incorporated by reference.

44.     On July 27, 2021, Cox's outside counsel sent a letter to Super Tower, WNAC, and Mission's outside counsel that requested Super Towers and WNAC indemnify and hold harmless Cox under the WNAC Agreement. Cox's outside counsel specifically requested that Super Tower and WNAC pay Mission the claimed difference. I understand that Super Towers and WNAC have not agreed to indemnify and hold harmless Cox and, by their outside counsel, have stated they will not agree to terms related to the August 16, 2021 payment.  A true and correct copy of the July 27, 2021 letter is attached to this declaration as **Exhibit 15** and incorporated by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of United States of America that the foregoing is true and correct, and that this declaration was executed on August 2, 2021, in Atlanta, Georgia.

*Chris Tygh*
Chris Tygh (Aug 2, 2021 12:33 EDT)
CHRIS TYGH